# Supreme Court of Texas

No. 21-0998

In the Interest of A.A., G.A., and K.A., Children

On Petition for Review from the
Court of Appeals for the Seventh District of Texas

JUSTICE YOUNG, joined by Justice Blacklock and Justice Busby, dissenting.

Childhood in Texas should be an age of wonder and plenty, not privation or fear or neglect. Yet because of the failures of adults, innocent children across our State sometimes irretrievably lose some or all of the childhood they deserve. Whenever that happens, it is a tragedy for those children and for each now-broken family. It is also tragic for our State and its people, given the monumentally compelling interest we all share in the health, safety, and future of the youngest generation of our fellow citizens.

The children in this case are among those who have received less than they deserve. They cannot rely on their parents, which is one of the saddest conclusions any court can reach. The State's protection of these children, including from their parents—a subversion of the normal order, in which *parents* protect their children—therefore has been and remains necessary. On that point I agree with the Court.

But I cannot agree with the Court regarding *how* our law addresses these circumstances. Texas law provides potent tools to protect children, but—at this stage, on this record, and under the statutory provision on which the Court relies—the irrevocable termination of Mother's parental rights is not among them. To terminate any parent-child relationship under § 161.001(b)(1)(O), the State must satisfy multiple statutory conditions. One of paragraph O's antecedent requirements is that the child at issue was "remov[ed] from the parent" whose parental rights are at issue. Confirming that point, paragraph O contemplates "the return of the child"—that is, the restoration of the status quo ante. But no matter how we define "remove," these children were "remov[ed] from" Father, not Mother. A transfer to Mother would not be a "return" to her, either—another of paragraph O's requirements. And there is a third: Paragraph O only addresses removals to the State because of the targeted parent's "abuse or neglect." The children here, however, were removed from *Father* because of *his* abuse or neglect, not because of Mother's. As a matter of law, therefore, paragraph O does not even apply to this case.[1]

Neither the State nor the Court can show how *any* of these important requirements of paragraph O can be met here, much less under the statute's "clear and convincing" standard. Tex. Fam. Code § 161.001(b). Nothing justifies sidelining these unambiguous requirements. Tellingly, the lone but repeatedly cited precedent of this

---

[1] This Court's cases sometimes call the provision "subsection O," but the statute itself denominates § 161.001(b)(1)(O) as a "paragraph." *See* Tex. Fam. Code § 161.001(b)(1)(M) (describing "terminat[ion] . . . based on a finding" of "conduct . . . in violation of Paragraph (D) or (E)"). The *subsection* is § 161.001(b), and § 161.001(b)(1) is the subdivision. Like the Court, I refer to paragraph O.

2

Court that is invoked to support today's judgment is wholly inapplicable. In *In re E.C.R.*, 402 S.W.3d 239 (Tex. 2013), the parent whose rights were at issue was *the same parent* from whom the child was removed, *the same parent* to whom a return of the child would go, and *the same parent* whose conduct constituted the abuse that led to the child's removal.

There is no good reason for the Court to weaken paragraph O's requirements so thoroughly. Doing so is not necessary for the State to be able to (lawfully) protect these and any other children using the many other available legal tools at its disposal. Even to obtain *termination*, § 161.001(b)(1) has multiple additional grounds that are available and, if the allegations are true, more appropriate. Why, then, is paragraph O the only ground before us? Because, as the Court acknowledges, paragraph O is just so *easy* for the State that there is often little incentive to go beyond it. Now there will be even less. Paragraph O's textual limitations represent an unsuccessful legislative attempt to confine that provision's use; the courts have instead allowed it to proliferate.

So in exchange for diluting unambiguous statutory requirements, what do we get? An even more expansive and undisciplined use of paragraph O. What a terrible trade. Rather than erode the statute and risk consequences far transcending this single case, we should reverse the judgment below. Because the Court instead ratifies a seriously mistaken understanding of paragraph O, I must respectfully dissent.[2]

---

[2] I agree with the Court that we have jurisdiction to resolve the appeal, *see ante*, Part II, and confine my dissent to the Court's analysis of paragraph O and to its judgment affirming the decisions below.

# I

I share the Court's dim view of this case's history. Mother and Father consistently use drugs. Father is prone to domestic violence. Mother, deeming herself unable to care for the children, voluntarily relinquished custody to Father upon their divorce. The children often had no adult supervision at all. The list goes on. The Court rightly recognizes that these children have not received admirable or even acceptable parenting. Like so many other parental-termination cases that we see (and the People of Texas would be truly dismayed to realize just how many there are), it is terribly sad.

Fortunately, our law has many tools to protect and address the important rights of children when parents fall so far below our minimal standards. The most drastic such tool is to terminate the parent-child relationship. But termination is the last resort, not the first impulse; it ends one of the most "sacred" and "precious" bonds the law recognizes. *See In re J.W.*, 645 S.W.3d 726, 752 (Tex. 2022) (Young, J., concurring) (internal citations omitted). Termination, after all, threatens not just the right of a parent to retain a formal relationship with her child, but also the right of the child to retain such a relationship with her parent.

When the law requires termination, we must unflinchingly enforce it. But we should turn the sharpest of corners when doing so: "In a case involving termination of parental rights, the '"death penalty" of civil cases,' the importance of safeguarding a parent's right to a fair trial is even more pronounced" than usual. *Id.* at 751 (majority op.) (quoting *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring)).

This termination has not turned sharp corners, at least as to

4

Mother.[3]  I think it falters at the very first step—the premise that the law even *authorizes* that consequence under these circumstances.  The Court finds the necessary authority within Texas Family Code § 161.001(b)(1)(O), which provides:

> The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence: (1) that *the parent* has . . . (O) failed to comply with the provisions of a court order that specifically established the actions necessary for *the parent* to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from *the parent* under Chapter 262 for the abuse or neglect of the child.

Tex. Fam. Code § 161.001(b)(1)(O) (emphases added).

The thrice-reiterated focus in that provision is on "the parent," which must refer to the same person each time it is used in the paragraph's single sentence.  Nothing displaces the presumption of consistent usage and it is hard to see any linguistic way that "the parent" could mean someone different in any of its appearances.  Each time "the parent" appears, it imposes another condition on paragraph O's applicability.  Without the same parent meeting all three requirements, paragraph O cannot apply.

Accordingly, to take the three conditions as they would chronologically unfold in a case, here is the *minimum* the State must establish to invoke paragraph O:

---

[3] There is no dispute as to Father.  The record focuses heavily on his behavior and the need for the State to remove the children from his custody.  The judiciary was empowered to terminate his parental rights, and no challenge to that determination is before us.

- "abuse or neglect of the child" by the parent

- that led to "the child's removal from the parent"

- such that a "court order[ed]" service plan was created as a condition "for the parent to obtain the return of the child."

The State would have to show that *all three* conditions apply to Mother. Not even one of them does:

- *Father's* "abuse or neglect" is what led to the State's machinery cranking into gear.

- After the State got involved, *Father* tested the State's patience with the behavior that the Court describes, *ante* at 4–5, leading to "the child[ren]'s removal from [*Father*]." Mother had *no* rights to possession, legally or physically; she could not so much as see them without Father's agreement. So the State certainly could not "remov[e]" the children from Mother.

- And because Father alone had all rights to the children, any "return of the child[ren]" would not have meant going to *Mother*.

In short, *Mother* cannot be "the parent" as paragraph O uses the term.

True, Mother clearly failed to comply with her service plan. *See ante* at 23–24. That fact is relevant to paragraph O, however, *only* if the antecedent conditions of paragraph O are met. One cannot blame bad weather in Chicago for a delayed flight if the reason it never left Miami was that the FAA deemed the airplane unfit for flight. Had Mother retained some rights of custody that the State could remove *from her* before issuing the service plan, things might be different; had the plane intending to depart from Miami been just barely airworthy enough to depart, bad weather in Chicago might be a culprit for its nonarrival there.

But the record shows that Mother could not implicate paragraph

6

O. *Father* had sole custody and it was *his* malfeasance that led to the State's intervention. Because these points illustrate why it is mistaken even to proceed beyond the applicability of paragraph O (much less to address the "best-interests" analysis, *see id.*, Part IV), I will address them in more detail.

## A

First, in no ordinary sense of the word "removal" were the children "removed" from Mother. How could they have been? Mother did not have legal or physical custody of the children. *Her* rights were not altered by the children's removal. As the Court acknowledges, Father had "*sole* legal care and physical custody" of the children at the time of removal. *Ante* at 3 (emphasis added).

I will spot the Court its expansive definition of removal. According to the Court, removal concerns not "*just* . . . physical possession" and implicates a "bundle of conservatorship rights from one or both parents to DFPS." *Id.* at 10 (emphasis added). I assume that is right. But even so, it is *just* "one" and *not* "both parents" here. For it to be "both," *each* must have something that the State has removed. The Court's own definition cannot justify its outcome.

That is because the record resoundingly confirms in so many ways that the children were removed from Father alone. In its "Order of Termination," the trial court found that the status quo ante was the parents' divorce decree, which is what granted Father sole custody. And the Court's chief authority from the record—the "affidavit in support of removal" that the Court cites over and over—illustrates my point:

- The affidavit mentions Mother in it occasionally, but only in

the context of supplying information *about Father*.

- From its start, the affidavit makes clear that its "allegations" concerned *only* "the Neglectful Supervision of [A.A.], *by her father*." (Emphasis added.)

- The "facts necessitating removal" section provides five bullet points summarizing the request for removal. Each of the five involves Father; Mother does not appear *in a single one*.

- In the four-page narrative following that high-level overview, the only mentions of Mother are to obliquely note her absence and the difficulty in finding her.

- Eventually, *Mother herself* got in touch with the State's investigator (the affiant). The affidavit then recounts the call that the investigator had with Mother, primarily to obtain Mother's perspective on Father.

- Consistent with the rest of the affidavit, its "conclusion" does not even mention Mother, but focuses exclusively *on Father*: "All reasonable efforts . . . have been made . . . to prevent or eliminate the need for removal of th[ese] child[ren] and to make it possible for the children to remain in the care of [Father]. It would be contrary to the safety and welfare of the child[ren] to remain in the custody of [Father]."

The Court could rightly rely on such a document regarding Father if he (or the removal of *his* rights) were at issue. But the record lacks any accompanying document for the Court to rely on regarding Mother. Understandably so: The children were *not* in Mother's custody and so there was no need or ability to *remove* them from her custody, physical or otherwise. The State could not "remove" them from her possession any more than it can "remove" the Hope Diamond from mine.

Thus, the Court's observation that "[t]he Department's affidavit shows what the trial court relied on [in its orders] to find that

8

continuation in the home of [Mother] would be contrary to the children's welfare" cannot be relevant as to Mother. *Ante* at 16. There could *be* no "continuation" with Mother, of course. More importantly, the affidavit does not speak to any conclusion as to Mother.[4] In fact, the affidavit concludes by saying that "[a]ll reasonable efforts . . . have been made by [DFPS] to prevent or eliminate the need for removal of th[ese] child[ren] and to make it possible for the children to remain in the care of [Father]. It would be contrary to the safety and welfare of the child[ren] to remain in the custody of [Father]." Removal from Mother *is not even mentioned*.

So what *was* removed from Mother by the State in these proceedings? Nothing. Before the removal of *Father's* rights, Mother had no rights (even to see the children) except at Father's sufferance. Once the State replaced Father, Mother still had no such rights (even to see the children) except at the State's sufferance.[5] The State's removal of the children from Father, in other words, set forth no independent alteration to *Mother's* non-existent rights of custody or possession. Nothing changed *for her*: the State simply stepped into Father's shoes

---

[4] The Court notes that "though Mother's positive test was not mentioned in the Department's removal affidavit, a parent's methamphetamine use surely poses 'an immediate danger to the physical health or safety of [a] child.'" *Ante* at 18. Agreed—such drug use poses a danger. And other provisions in § 161.001(b) address exposure to dangers. But the Court misses the point. The reason Mother's test is not included is because the affidavit only concerned *removal from Father*.

[5] I use the term "right" only colloquially. Because this right was totally dependent on someone else's approval, I am hesitant to call it a right at all. But it was certainly not one that was then *removed*. Mother's right to visitation, as framed by the Court, seems more akin to a right to *request* visitation—first of Father and then, when the State stepped into Father's shoes, of the State. The failure of Father (or the State) to agree to any request for visitation would not be the removal of a right, but a failure of an agreed-upon condition.

with respect to agreeing to any request that Mother may have made about access to the children.

The Court actually confirms the point: "[T]he children were transferred to DFPS as their conservator, temporarily ending both Mother's and Father's exercise of control of them without DFPS approval." *Ante* at 22. Exactly. Mother had no exercise of control of the children *before or after* their transfer to the State. The children's removal from Father caused no further loss of rights to Mother.

The Court really has nothing else. From its first paragraph, it repeatedly *says* things like "[t]he court's order ended both parents' legal custody of the children and transferred them to the Department's statutory conservatorship based on evidence of misconduct by both parents that amounted to abuse and neglect," *id.* at 2, or the "removal order expressly affects Mother's rights," *id.* at 15. But the Court never articulates *what* those rights are and *how* those rights were "expressly affect[ed]." When it comes to the question at the heart of this dispute— what right was removed *from Mother* and transferred to the State?—the Court is all hat and no cattle. To maintain the metaphor, the Court is bootstrapping. It can only appear to satisfy the "removal" requirement by conflating (a) the *desired outcome* (permanent termination of Mother's status as a mother) with (b) the *necessary prerequisite for paragraph O's ability to achieve that outcome* (some actual removal of the children from Mother—even in the rather abstract way that the Court frames removal—*before* a service plan was issued). Said differently, the ultimate termination depended on Mother's failure to comply with a service plan, but the issuance of a service plan that could affect termination under

10

paragraph O required some initial "removal" of the children. The *ultimate* termination cannot itself be the *initial* removal of rights.

In short, all that Mother had, all along, was her mere status *as the children's mother* and the bare possibility of restoration. That meager but precious status is not something that the State could or did "remove" before Mother received a service plan. Removing that status from her is what the State hoped to achieve at the *end*. But to achieve that final result through paragraph O, the State had to remove the children from Mother at the *beginning* of parental-termination proceedings.[6]

Without such a showing, paragraph O has no power in this case. That paragraph's power—its rather fearsome and potentially abused power, as the Court also acknowledges, *see ante* at 20—lacks force unless "the parent" is one from whom the children *can be* "remov[ed]." Here, the children cannot have been—and thus were not—removed from Mother.[7]

---

[6] The Court expresses incredulity that paragraph O might not be able to reach someone who, because of her own failings, started out with so few rights. *Ante* at 22. But that gets the reasoning backward. We cannot start with the conclusion (*this is an unfit parent*), then force paragraph O to accommodate the desired outcome (*this paragraph allows termination here*).

[7] Beyond paragraph O's "removal" requirement, its "return" requirement provides another reason to reach the same result. The "court order" (the service plan) must be one "for the parent to *obtain the return* of the child who has been in" state custody. Tex. Fam. Code § 161.001(b)(1)(O) (emphasis added). According to the Court, paragraph O "gives a parent like Mother an opportunity to have the child *returned* to her by demonstrating her parenting ability through compliance with the service plan." *Ante* at 21 (emphasis added). It is the promise of a restoration of the status quo ante.

But because Father had sole legal custody, Mother could not obtain their "return." *Return* means "give back" as a transitive verb or "go back" as an intransitive verb. *Return*, Webster's New International Dictionary (2d ed. 1934). I can return something to you that I borrowed from you; I can return to

11

## B

Even if I could be persuaded that the removal *was* in any sense from Mother, that still would be insufficient. Under the statute, the relevant removal had to have been caused by Mother's "abuse or neglect." Tex. Fam. Code § 161.001(b)(1)(O). The Court accurately describes the abuse and neglect that the children wrongfully endured. But the abuse or neglect *that led to their removal* was committed solely by *Father*. *Ante* at 17. Had *Father* not fallen short, there would have been no investigation and no removal. The affidavit makes that point abundantly and painfully clear. Far from the statutorily required direct link between the removal and "the parent['s]" conduct, however, the record offers only attenuation when it comes to Mother. Her conduct played no role in the investigation or subsequent removal of the children.

The Court's response is to blame Mother for abusing and neglecting her children because, long before, she left them with Father, who later abused or neglected them. *Id.* at 2. As unfortunate as that turned out to be, it has nothing to do with this removal, either legally or factually, and thus nothing to do with paragraph O.[8]

---

where I was before. Neither works for these children vis-à-vis Mother. Again, both the Court and the temporary orders make several conclusory mentions to the children "return[ing] home" to Mother or that "continuation in the home of [Mother] . . . would be contrary to the children's welfare." *Ante* at 15–16. But they cannot be "returned" (from State custody) *to* Mother because they were not removed (by the State) *from* her. Nor can they "return" to her home or "continue" living in her home because they were not there to start with. Restoring the status quo ante would mean their return to Father's care—an outcome that the law *does* forbid. But that tells us nothing about Mother.

[8] Again, paragraph O—despite being treated as a general catch-all—is not drafted to cover every manner of sin. *Other provisions* of subdivision (b)(1) exist to address the allegations against Mother. They were not used.

12

To the contrary, the reason that Father had sole custody and total control was not merely Mother's acquiescence. Her lack of custody was instead the product of a New Mexico *court order*. That court expressly found that the new arrangement—giving Father custody—was in the children's best interests. The court found that "[Father] is a fit and proper person to have the sole legal care and physical custody of the minor children." If Mother's relinquishment of the children to Father *was itself* the "abuse" that paragraph O references, then it was abuse that the New Mexico state court validated. The State cannot plead ignorance of that divorce decree, which features prominently in the record. Indeed, the judgment in this case deems the divorce decree to be the status quo ante, as I discussed above.

Perhaps the New Mexico court was wrong in its finding about Father. Perhaps Mother was wrong, too. As she testified in this case, she judged herself to have been emotionally incapacitated and far less able to care for the children than Father, who "was doing better than I was doing at the time, so I figured they would be better with him." Perhaps she (and the New Mexico judge) were also wrong about Father's trajectory with respect to his anger management or his greater capacity to care for the children with his mother's help. Perhaps the "noticeable change in his anger" that Mother perceived was illusory. The shared error—expecting more from Father than Father ultimately gave—was unfortunate.

But it is extraordinary to deem that error as *abuse*—abuse that remained in hibernation until it manifested years later—that could constitute the foundation of a paragraph O termination. Frankly, I am astounded that the Court could deem *Mother* to have committed an act of

abuse sufficient to warrant *parental termination* just for allowing Father custody *when an American court* found that to be the appropriate result.

The Court continues that, after the custody arrangement was settled by judicial decree, the children later alerted Mother to Father's subsequent abuse. That, too, the Court says, qualifies as *Mother's* abuse—even though she immediately alerted the Texas authorities, which investigated and ultimately charged Father. *Ante* at 4. Recall that Mother was totally dependent on Father at this point with respect to the children—yet she provoked him by reporting him and causing his arrest. Not good enough, the Court announces. The Court has less to say about what *did not* happen after her call. It admits that "[t]he incident led to Father's indictment . . . for causing intentional bodily injury to a child." *Id.* at 4. But the incident did not lead to the children's removal—the affidavit in support of removal does not even *mention* it.

The Court's theory of how Mother's conduct had any causal relationship to the State's removal of the children is worthy of Rube Goldberg. A *New Mexico court* gave Father custody because it was in the children's best interests. And when Mother called the police because of Father's later behavior, the *Texas government* took no steps to change that custody arrangement; nothing in the record suggests *that* behavior had anything to do with the State's investigation of Father or its removal of the children. All its stated reasons are wholly separate. I do not see how *Mother's* conduct in either instance remotely qualifies as the "abuse or neglect" that paragraph O addresses.

It seems to me that the Court just needs something—anything—that remotely attaches to the statutory language. The Court defends its

position with what I regard as true but utterly irrelevant: the principle that danger of abuse or neglect is "centered on risk, rather than just a history of actual abuse or neglect." *Ante* at 14 (citing *E.C.R.*, 402 S.W.3d at 247). To the extent that the Court means that Mother's behavior in leaving the children with Father was analogous to the prior abuse of one child that constituted a "risk" to another, as the Court held in *E.C.R.*, the New Mexico court's validating action (like the Texas authorities' refusal to remove the children from Father) severs any causal link. To the extent that the Court believes that there is a risk of abuse or neglect if these children are to be placed with Mother, even though there has been no "history of actual abuse or neglect" from her yet, I readily agree. As the Court notes, *even Mother agrees*, via her counsel. *Ante* at 18. But *that* "risk" of abuse or neglect does not satisfy paragraph O; it was not why the children were removed. The State can protect the children, of course—but not by using paragraph O.

Ultimately, the Court's risk analysis and emphasis on *E.C.R.* are misplaced. Today's decision cites *no other* precedent from this Court to support its paragraph O conclusions, but the question here—whether the children were removed *from Mother*—was not even at issue in *E.C.R.* That case turned simply on whether risk could be considered in an analysis of abuse or neglect. We rejected the mother's argument that paragraph "O was inapplicable because [her] child was not removed for actual abuse or neglect, but only because of the *risk* of abuse or neglect." *E.C.R.*, 402 S.W.3d at 244 (emphasis added). That point is not in contention in this case. Abuse and neglect necessarily include risk. But such a risk analysis is dependent on the children (1) being removed from

the parent whose rights are subject to being terminated and (2) because of the abuse or neglect (including *risk*) of that parent. In *E.C.R.*, "the record conclusively establishe[d] that E.C.R. was removed from [his mother]" and that she was the source of the risk. *Id.* at 249. The record here, however, establishes neither of those things. If *E.C.R.* tells us anything useful for this case, it can only support my view, not the Court's.

I again note that rejecting the application of paragraph O does not equate to giving Mother free reign. A documented risk will allow the State to protect the children in *other* ways, such as by not allowing Mother actual custody pending completion of a (properly created) service plan or by bringing termination proceedings under other grounds.[9] Thus, I can again agree that "[t]he trial court could have believed that the affidavit demonstrated 'an immediate danger' to the children if they were placed in Mother's care," *ante* at 17, without agreeing that this is relevant to the *termination* inquiry under paragraph O. The history that disturbs both the Court and me will be *deeply* relevant to whether the children are allowed to be in Mother's physical custody, and perhaps to a future termination proceeding, as was true in *E.C.R.* But for the risk analysis to be relevant in *this* proceeding brought under paragraph O, the children must have been removed from Mother due to *her* abuse and neglect. They were not. Paragraph O does not apply for this additional reason.

---

[9] The Family Code provides for termination on different grounds—not under paragraph O, that is—for genuinely bad conduct. Among other things, a court may hold a parent responsible for "engag[ing] in conduct or knowingly plac[ing] the child with persons who engaged in" dangerous conduct or "knowingly plac[ing] or knowingly allow[ing] the child to remain in conditions or surroundings which endanger" the child. Tex. Fam. Code § 161.001(b)(1)(D), (E). Perhaps tellingly, Father's rights *were* terminated under those grounds—Mother's were not. Her rights were only terminated under paragraph O.

## C

The Court's holding today could have profound consequences for other families. For one thing, eliminating core limitations of paragraph O creates a different regime for parental termination than the one that the legislature demands. The legislature's careful calibration and balance in the Family Code is not something that we should disturb. I hope that the Court's statement that its "judicial antennae are raised and attuned to potential misuses of (O)" will prove true. *Ante* at 20. But after today's decision, one might be forgiven for a measure of doubt.

More specifically, I fear the consequences for truly innocent parties who could lose their parental rights due to the fault of the *other* parent. What should they make of this Court's willingness to deem as "abuse" Mother's compliance with a New Mexico court that found Father "fit" enough to have "sole" custody and that this arrangement was in the children's best interests? And if that is not enough, what should they make of situations in which, unlike with the New Mexico divorce decree here, there is no judicial imprimatur of an agreement to share custody?

For such reasons, today's decision could plant the seeds of distrust between parents whom we expect to continue co-raising a child. Consider a mother who, through no choice or fault of her own, must be temporarily absent from her children. Perhaps she is deployed overseas by the military, earning a living for her family by working offshore on a rig for weeks or months, or forced through illness to be under medical care for an extended period. (Under some of these circumstances, particularly if the parents have divorced, it may be necessary or beneficial to give the other parent legal authority over the children, but for purposes of this

17

analysis I doubt that it would matter much.)  Suppose that during such an extended absence, the father goes off the rails.  Under the Court's decision today, if the mother knew of any shadows in the father's past, the mother's very act of leaving the children behind with him could be deemed "abuse" even if she was utterly convinced that the father's demons would *stay* in his past.

Picture that mother coming home from deployment to find, to her dismay, the father addicted to drugs and alcohol.  Removal *to* State custody from the father would be appropriate, but I think it would be too much if that act also took away the mother's rights under the theory that she herself had abused or neglected her children by leaving them in what she *thought* was the capable and loving hands of their own father.  Now, instead of a well-deserved and happy homecoming, the mother finds herself embroiled in a controversy with the State.  I would think that the mother in this story would not be the true cause of the abuse, neglect, and subsequent removal.

Perhaps the Court agrees—but its decision today is cold comfort for anyone ever in that situation.  The Court's response?  "[T]he military veteran mother would easily complete any service plan that might be proposed." *Ante* at 23.  Maybe that parent will be able to satisfy the State; maybe not.  As the Court itself noted only pages earlier in its opinion, "[t]hese plans can be difficult—perhaps impossible—to comply with fully," *id.* at 20, which surely makes the encouraging words to the military veteran a bit less cheery.[10]

---

[10] The frequent "impossibility" of complying with service plans raises a Pandora's box of other issues about paragraph O.  And it perhaps explains why the legislature has *tried* to limit when paragraph O is available.

18

All of this could be avoided just by following paragraph O as the legislature wrote it. Doing so would take parental termination of the mother's rights off the table, even if the State found it necessary to subject her to serious scrutiny before allowing the children to live with her again. And I agree, of course, that unlike the mother in the illustration, Mother in *this* case is not a sympathetic figure. The Court attempts to downplay my "trepidation," *id.* at 23, mostly by continuing to highlight Mother's misconduct. "Notably," it states, "the mother in the hypothetical does not have a long history of methamphetamine use and instability, and she did not test positive for methamphetamine at the outset of proceedings." *Id.* at 20 n.47. Indeed—that is my whole point. *This* case does not involve innocent parties, which is why I am expressing concern about *other* parties. This Court's decisions cannot be confined to the parties before us; we grant review to set precedent for all other cases. The consequences of today's decision on *innocent* parties are among the decision's costs.

In short, I worry that holding that "Mother's misconduct in exposing her children to Father's abuse and neglect was itself abuse and neglect on her part," *id.* at 2, goes too far. A parent's informed choice to leave children with the other parent under the belief that the parent is no longer a danger and poses no threat should not become fodder for a sort of strict liability for neglect or abuse. The law should and does hold parents responsible for *their own* actions. But it is mistaken to hold them responsible for the actions, mistakes, or inactions of another when such vicarious liability is as attenuated as it is here—at least when it comes to unleashing paragraph O to totally terminate a parent-child relationship.

19

## D

Lastly, while I don't think Mother's rights can be terminated under paragraph O at this point, this conclusion does not require ordering the children's return to her physical custody. Indeed, at oral argument, Mother's counsel agreed that, if the consequence of Father's termination and this litigation is that Mother is deemed to have any possessory rights to the children, the State could—and should—instantly intervene and prevent her from having actual, physical custody. Why? Because, as her counsel conceded with candor that I appreciate, "[Mother] hasn't done anything to harm these kids yet, but, in all likelihood, if we put those children back with her, something bad is going to happen."

Exactly: "in all likelihood" refers to *risk*. *This* is where the Court's analysis of risk from *E.C.R.* could come into play. The "risk" here comes from Mother's drug use and other serious deficiencies documented in the record. Multiple provisions of § 161.001(b)(1) might apply—including, if done properly, paragraph O.

Here is how paragraph O *might* apply in this very case, if used correctly. I see nothing that would require the State to forget the risks described above; if the State believes that such risk is real and ongoing, the State would have cause to remove the children *from Mother* for paragraph O's purposes. The removal would be from her constructive custody—it would, that is, constitute the removal of *rights* that first would be formally conferred on her, thus satisfying the paragraph's requirement. Upon that removal, a court could then issue a new service plan. If Mother, fully aware of the consequences of failure, is able to comply, then restoration may turn out to be possible. According to the

20

Court, I "hope[]" that "another round" of litigation will lead to termination. *Ante* at 23. The Court is mistaken. In fact, what I hope for, in this case and in *every* case, is restoration: that the God-created bonds between parent and child might heal. I believe that each of my colleagues so desires. History and experience, of course, prove that many parents are incapable of such progress, which is why termination is an available option. If no progress can be made here—and I readily acknowledge, as Mother's counsel does, that the outlook is not promising—then paragraph O (along with other provisions) could be properly triggered and termination would be legally permissible.

Frankly, just as I see no reason why other paragraphs of § 161.001(b)(1) could not have been used, I see no reason why this process under paragraph O—one that respects the Family Code's requirements—could not have happened much earlier. Once the children were removed from Father, the State could have acknowledged Mother's possessory or custodial rights once he was out of the picture. And if the State deemed Mother herself to be a similar risk, it immediately could have taken steps to proceed against her the same way it proceeded against Father. For example, it could have obtained a comparable "affidavit in support of removal" explaining why removal *from Mother* was justified, including based on "risk." But nothing in this record suggests that the State did so—hence my conclusion about the result today—even though the State *could* have proceeded as I describe.

## II

The Court describes my position not only as "illogical" but as devoid of a "legal basis." *Ante* at 22. I must respectfully disagree. Those who

read the two opinions can decide which one has a firmer tether to the statute. In my view, at least, nothing in the Court's opinion disturbs my reading of paragraph O; nothing in it shows how the State has remotely satisfied paragraph O's antecedent requirements such that termination on that ground is even a plausible outcome on this record; and nothing in it provides any meaningful limit for future misuses of paragraph O.

I acknowledge the Court's frustration that I can agree that Mother is unfit yet disagree with today's judgment. *E.g.*, *id.* at 23. I acknowledge, and indeed honor, its desire to end the litigation hovering over this family. *Id.* But while efficiency is not nothing, neither is it everything. The Court itself recognizes that "[t]he more straightforward path is not always the right one," *id.* at 20, and for the reasons I have stated, accelerating this termination by cutting some corners will cost us all far more than unrelentingly following the law would, even when—from the perspective of a single case—doing it right might seem futile.

In my judgment, the law does not yet authorize the courts to terminate Mother's parental rights on this record. I hope that I am wrong about the consequences of today's decision being felt elsewhere by future parties who are far less culpable. I am certain that my colleagues in the majority pursued the same goal that I have: reading the statute in its context to the best of our ability. Despite my reluctance to disagree with the Court, my reading of the statute compels me to respectfully dissent.

Evan A. Young
Justice

**OPINION FILED:** June 9, 2023

22